J-A14017-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ROBERT NICHOLS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PRO-SPORT & LUXURY OF WEST | : | |
| CONSHOHOCKEN LLC, ABDUL | : | |
| BASBOUS, AND HAMID BASBOUS | : | No. 1063 EDA 2025 |
| | : | |
| Appellant | : | |

Appeal from the Order Entered May 12, 2025
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  2024-06360

BEFORE:  DUBOW, J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED JULY 15, 2026**

Pro-Sport & Luxury of West Conshohocken, LLC (Pro-Sport), Abdul Basbous (Abdul), and Hamid Basbous (Hamid) (collectively, Appellants) appeal from the April 3, 2025, order granting Robert Nichols's (Nichols) petition to appoint a receiver for Pro-Sport, which was rendered final by the trial court's May 12, 2025, order appointing Robert H. Holder (Holder) as Pro Sport's receiver.[1]  After careful review, we affirm.

---

[1] Pennsylvania Rule of Appellate Procedure 311(a)(2) permits an interlocutory appeal as of right from, *inter alia*, "[a]n order confirming … an attachment, custodianship, receivership, or similar matter affecting the possession or control of property…."  Pa.R.A.P. 311(a)(2).  Appellants filed a notice of appeal from the April 3, 2025, order, which was not appealable under Rule 311(a)(2), as the receiver had yet to be named.  **See Schwotzer v. Schwotzer**, 287
*(Footnote Continued Next Page)*

Abdul and his son, Hamid (together, Sellers), were the sole owners of Pro-Sport, a used car dealership with two locations in Montgomery County, Pennsylvania. Hamid served as Pro-Sport's president, and Abdul managed the service department.

In 2019, Sellers wished to transition into real estate. At that time, Sellers "agreed that [Nichols, an individual with decades of experience in car sales,] would use his resources to buy and sell used cars[,] and used cars would be shown on Pro-Sport's lots. Pro-Sport would service and sell the cars, and the parties would split the profits" evenly. Trial Court Opinion, 5/14/25, at 2.

The trial court detailed the parties' early relationship as follows:

[Nichols] began working … as the Marketing Director. [Nichols's] duties entailed checking and adjusting vehicle pricing, taking photographs of the vehicles for sale, and running paperwork and deposits to the bank.

_____

A.3d 891 (Pa. Super. 2022) (unpublished judgment order) (quashing the appellants' appeal from the order granting the appellee's motion for appointment of a custodian, as it did not "confirm" the custodianship under Rule 311(a)(2); but ultimately concluding the related appeal from the court's subsequent order appointing a custodian was properly before us); *see also* Pa.R.A.P. 126(b) (providing that unpublished memoranda filed by this Court after May 1, 2019 may be cited for their persuasive value). However, on May 12, 2025, within a month after Appellants filed their notice of appeal, the trial court entered an order appointing Holder as receiver for Pro-Sport. Though Appellants should have filed the instant appeal after the trial court appointed the receiver, "we will regard as done that which ought to have been done," *Randt v. Abex Corp.*, 671 A.2d 228, 230 n.2 (Pa. Super. 1996) (citation omitted), and we will consider the merits of the appeal as if properly filed from the May 12, 2025, order. We have corrected the caption accordingly.

[Nichols] instituted a new business model called "Pricing and Pictures," whereby [Nichols] would take pictures of each vehicle and set the price "as cheap as humanly possible."

Trial Court Opinion, 5/14/24, at 2.

On January 1, 2022, Appellants and Nichols executed a Membership Interest Purchase and Operating Agreement (Operating Agreement). *See* Complaint, 4/8/24, Exhibit B (Operating Agreement). Effective the same date, Abdul and Hamid each transferred to Nichols 1/6 of their respective membership interests in Pro-Sport, such that Nichols acquired a total 1/3 membership interest in Pro-Sport. *See id.*, Exhibit A (Assignments of LLC Membership Interest executed by Abdul and Hamid). The Operating Agreement required Nichols to pay $25,000.00 each to Abdul and Hamid on or before April 1, 2022. *Id.*, Exhibit B ¶ 1.2. Nichols supplied these payments as required. Order, 4/3/25, Findings of Fact ¶ 9.

The Operating Agreement detailed the governing distribution and special allocation schemes (which we set forth in full *infra*). Complaint, 4/8/24, Exhibit B ¶¶ 3.1-3.2. The parties later executed an addendum requiring Nichols to pay $125,000 to Abdul and Hamid by January 1, 2024. Until the $125,000 was paid, the addendum also required Nichols to give to Sellers 75% of any commissions or distributions he received from the sale of JDM[2]

---

[2] JDM refers to cars from the Japanese Domestic Market, which accounted for approximately 40% of Pro-Sport's total profits. Trial Court Opinion, 5/14/25, at 1.

vehicles, in addition to the distributions described in section 3.2 of the Operating Agreement. Trial Court Opinion, 5/14/25, at 2.

In approximately December 2023, the relationship between the parties deteriorated significantly. In his complaint, Nichols detailed a fraudulent wire transfer made by the then-controller of Pro-Sport; a disagreement concerning the manner in which quarterly profits distributions should be made among Hamid, Abdul, and Nichols; Hamid's declining willingness to communicate with Nichols; and an incident in which Hamid verbally and physically attacked Nichols at a Starbucks. *See generally* Complaint, 4/8/24, ¶¶ 16-21. Nichols alleged that

> [o]n February 7, 2024, Hamid restricted [Nichols's] access to all of the informational tools necessary to run the business. On or about February 19, 2024, Hamid sent [Nichols] a letter entitled "Separation from Employment" and unilaterally attempted to terminate [Nichols's] employment in Pro-Sport.

*Id.*, ¶ 22.

Nichols initiated the underlying action by filing a complaint on June 7, 2024. Nichols asserted causes of action against Hamid for breach of fiduciary duty, minority shareholder oppression, breach of fiduciary duty of officer, and conversion. Against all Appellants, Nichols alleged causes of action for breach of the Operating Agreement, breach of the fiduciary duty of loyalty under the Pennsylvania Uniform Limited Liability Company Act of 2016 (LLC Act), and breach of the fiduciary duty of care under the LLC Act. Nichols also sought a declaratory judgment requesting, *inter alia*, that the trial court (1) deem the

"Separation from Employment" letter to be invalid; (2) appoint a liquidating receiver under 15 Pa.C.S.A. § 1985;[3] and (3) declare that Pro-Sport is to begin the process of winding up and dissolving. Moreover, Nichols requested an accounting by Hamid and Pro-Sport.

In support of his claims, Nichols alleged, *inter alia*, that (1) Hamid stole from Pro-Sport by using corporate assets for his own gain;[4] (2) Hamid pays his wife a salary using Pro-Sport's assets—without his wife providing services for the company—and has supplied her with two Pro-Sport vehicles at no cost to her;[5] (3) Hamid often uses his company credit card to pay for personal dinners and obligations, his family's phone bill, and marina expenses; (4) Abdul receives a $10,000-$12,000 monthly salary despite performing nominal duties for Pro-Sport; and (5) Hamid has refused to distribute profits as required by the Operating Agreement. ***See generally Complaint***, 4/8/24, ¶¶ 22-39.

_____

[3] Section 1985—contained in Subchapter G (relating to involuntary liquidation and dissolution) of the Pennsylvania Business Corporation Law—permits a court to appoint a liquidating receiver to collect and dispose of corporate assets.

[4] Nichols asserted that Hamid took possession of a Porsche 911, a trailer, two Nissan GT-R Skylines, and a Toyota Soarer for his personal use. Complaint, 4/8/24, ¶¶ 28, 30. In addition, Nichols averred that Hamid used his position in Pro-Sport to acquire a .50 caliber assault rifle and to write a $15,000 check to an individual who is not part of the company. ***Id.***, ¶ 88.

[5] Nichols identified the vehicles as a Mercedes AMB GLS 63 and a Mercedes E63 Wagon. Complaint, 4/8/24, ¶ 25.

On June 7, 2024, Appellants filed preliminary objections in the nature of a demurrer, alleging that Nichols (1) was an at-will employee whose employment was lawfully terminated, and (2) is not a member of the LLC.

Nichols promptly filed an answer and new matter in response to the preliminary objections, averring that he owns a 1/3 interest in Pro-Sport. In support of his new matter, Nichols attached as exhibits the Schedule K-1s filed with Pro-Sport's federal tax returns for 2022 and 2023. *See* Answer and New Matter, 6/27/24, Exhibit A (Pro-Sport's 2023 Schedule K-1) and B (Pro-Sport's 2022 Schedule K-1). The trial court ultimately overruled Appellants' preliminary objections. *See* Order, 9/3/24.

On July 30, 2024, Nichols filed an emergency petition to appoint a receiver. Therein, Nichols sought the appointment of "a receiver on an equitable basis" under Pa.R.C.P. 1533. Emergency Petition to Appoint Receiver, 7/30/24, ¶ 6. In part, Nichols alleged that "[a] receiver is needed to ensure that [] Hamid [] does not improperly distribute or otherwise liquidate these assets prior to the disposition of [Nichols's c]omplaint." *Id.* ¶ 3; *see also id.* ¶ 6 (asserting that Hamid "has improperly used company funds and resources for his personal gain and to the detriment of Pro-Sport."). Nichols attached thereto his own affidavit, as well as the affidavit of John Allen (Allen), whom Pro-Sport employed as its general manager until July 5, 2024. *See id.*, Exhibit 1 (Nichols Affidavit) and 2 (Allen Affidavit).

Allen alleged in his affidavit that in the several months preceding the end of his employment, he noticed that the vehicles available for sale were of lower quality, and in some cases, were sold for a loss. *Id.*, Exhibit 2, ¶ 10. Allen described Hamid's behavior as "explosive and erratic. The atmosphere [at the dealership] is tense." *Id.*, ¶ 10. Moreover, Allen detailed several concerns: (1) information from an auto auction, from which Pro-Sport purchased vehicles, stating that the auction facility was not being paid or payments were being made late; (2) a conversation during which Abdul acknowledged using $142,000 from his private account to fund Pro-Sport's payroll; (3) a statement from the employee handling financing that reinsurance premiums were unpaid; and (4) the Commonwealth of Pennsylvania had suspended Pro-Sport's ability to issue titles. *Id.*, ¶¶ 12-15.

Appellants filed a response. Appellants argued Nichols lacked standing to initiate the action, as he is not a member of Pro-Sport, and his employment had been terminated in February 2024. *See generally* Response in Opposition to Emergency Petition to Appoint Receiver, 8/21/24.[6]

The trial court conducted hearings on Nichols's emergency petition to appoint a receiver on October 2, October 21, and November 8, 2024. During the hearings, the trial court heard testimony from Nichols; Hamid; Richard

_____

[6] Later, on October 7, 2024, Appellants filed an answer, new matter, and counterclaim in response to Nichols' complaint. Based on our current procedural posture, we need not detail the contents of this filing.

- 7 -

Trickett, Jr. (Mr. Trickett), Pro-Sport's controller as of March 2024; and Kim Baker (Mr. Baker), an independent contracting consultant for DealerStrong, who has worked with Pro-Sport since February 2024.

Relevantly, Nichols testified that immediately after the parties executed the Operating Agreement, Hamid referred to Nichols as a one-third owner for, *inter alia*, bank and vendor meetings. ***See*** N.T., 10/2/24, at 36-37. Nichols's counsel also introduced the 2022 and 2023 tax returns for the business, which, he alleged, Sellers forwarded only after a court order directed them to do so. ***Id.*** at 37-38; ***see also id.*** at 37 (wherein Plaintiff's Exhibit 11 (Pro-Sport's 2022 Tax Return with Schedule K-1) was marked for identification), 40 (wherein Plaintiff's Exhibit 12 (Pro-Sport's 2023 Tax Return with Schedule K-1) was marked for identification). Nichols testified that the 2022 Schedule K-1 indicates he was allocated an approximately 33.24% ownership interest in Pro-Sport. ***Id.*** at 40. While the 2023 Schedule K-1 indicates Nichols received a business income of $114,246, Nichols testified that he did not receive a distribution in that amount during 2023. ***Id.*** at 41.

Nichols denied using the company's American Express credit card for personal expenses. ***Id.*** at 78. Nichols acknowledged using the company's American Express card to purchase items related to his work responsibilities, including signs for the building, marketing items, and gas. ***Id.*** at 77. According to Nichols, at some point after the relationship had begun to sour,

Hamid prevented Nichols from entering the property and called the police.  ***Id.*** at 79-80.

Nichols acknowledged that he removed the key fobs associated with all inventory at Pro-Sport's second location.  ***Id.*** at 91; ***see also id.*** at 91-92 (Nichols testifying that he spoke with a police detective before removing the key fobs from the property).  Nichols also agreed that he transferred funds from Pro-Sport's bank account into an account titled "Robert Nichols, for the benefit of Pro-Sport Motors."  ***Id.*** at 91; ***see also id.*** at 93 (Nichols stating this money was ultimately transferred back to Pro-Sport).  Nichols explained that he took these actions because he "was scared to death that [his] partner was operating [at] a huge financial loss to the detriment of myself without any control…."  ***Id.*** at 93.

Regarding the Mercedes AMG and the Mercedes E63 Wagon, Hamid testified that he ultimately sold both vehicles, and the proceeds of those sales went to Pro-Sport.  N.T., 10/21/24, at 234-35; ***see also id.*** (acknowledging that both vehicles were sold at a loss).  Hamid testified that in February 2024, after sending Nichols the termination letter, his own monthly salary increased from $10,000 to $12,500.  ***Id.*** at 242-44.  ***But see id.*** at 244 (Hamid stating, "[I]nitially [I] got $10,000 plus the $2,500 allowance for the health insurance and everything, but when I bumped up to that [higher salary]—my health insurance came out of that.  So I didn't get [$12,500] plus the [$2,500] like I was before.  … So it's relatively the same.").

Regarding the .50 caliber firearm, Hamid offered the following explanation:

> A customer came in to buy my vehicle[,] which was my vehicle that I was driving[,] which was a Ford Raptor. Once again, I bought cars to sell them. I had a $6,000 profit on the vehicle, so I took the [customer's] gun as a $4,000 trade-in to bring down the payment to [$]22,000[,] which was the sale price of the vehicle. So it was a $4,000 trade-in credit and that's how we got the gun.

*Id.* at 247.

Hamid denied taking a Toyota Soarer for his personal benefit. *Id.* at 248-49. Instead, Hamid testified the Soarer was a vehicle available for sale at Pro-Sport. *Id.* at 249.

Additionally, Hamid testified that Nichols's confiscation of the key fobs had a "severe impact" on the business. N.T., 11/8/24, at 6. Hamid explained, "I had to spend quite an amount of money to get a key maker there so we could duplicate the key fobs so we could continue to sell, deliver and show these cars." *Id.* at 7. In total, Pro-Sport paid $4,394 to replace the key fobs. *Id.* at 8.

Hamid acknowledged that Pro-Sport loaned him $114,000 for personal use. *Id.*; *see also id.* at 9 (Hamid testifying he used the loan "for a down payment on [his] house in Nantucket and some other expenses"). According to Hamid, Abdul provided his approval for the company to issue the loan, and the loan was documented with a promissory note. *Id.* at 8-9. Hamid testified that he repaid the loan in full within four months. *Id.* at 10.

- 10 -

Further, Hamid attributed the decline in Pro-Sport's profitability to titling changes, instituted by PennDOT, related to the JDM vehicles. N.T., 10/21/24, at 218; *see also id.* at 220 (explaining that the new titling process involved an enhanced safety inspection). Hamid testified that for approximately six months, the JDM vehicles were effectively "frozen" and could not be sold. *Id.* at 219; *see also* N.T., 11/8/24, at 18 ("So basically what happened with the JDM cars is once we couldn't title them, it just stopped, our cash flow."). During that time, Hamid estimated that Pro-Sport had about $600,000 tied up in inventory that could not be sold. N.T., 11/8/24, at 19.

Hamid testified that when Nichols moved money out of the Pro-Sport bank account, "some of the checks came through and bounced back to the state, which triggered an audit." *Id.* at 21. During the audit, PennDOT discovered Pro-Sport was "issuing tags out of the other location, which [we] were not allowed to do[.]" *Id.* According to Hamid, Nichols told Sellers it was acceptable to sell vehicles from one Pro-Sport location and issue titles from the other location. *Id.* As a result, PennDOT suspended Pro-Sport's authorization to issue titles for three months. *Id.* at 21.

Mr. Trickett started working as Pro-Sport's controller on March 25, 2024, *after* Hamid sent the termination letter to Nichols. *Id.* at 104. Mr. Trickett testified that the American Express credit cards were used for all business-related expenses, including the bookkeeping system, utilities, advertising, and purchasing vehicle parts and tires. *Id.* at 104-05. Mr. Trickett testified that

since he started working at Pro-Sport, he has not observed any improper charges to the company's American Express credit cards. *Id.* at 104.

Mr. Baker first provided an assessment of Pro-Sport in December 2023, and subsequently, in March 2024, he was "onboard[ed] as the fractional [general manager]." *Id.* at 116-17. Mr. Baker described confusion regarding the company's financial status at the time, because Pro-Sport had been operating without a controller for several months. *Id.* at 118. According to Mr. Baker, Pro-Sport was "hemorrhaging." *Id.* Mr. Baker reiterated that changes to the titling procedures severely impacted the ability to sell JDM cars, but testified that "for quite a while[,] the JDM side of the business was more than likely carrying and floating the business on the retail side and kind of masking the problem of what was really going on, on the retail side." *Id.* at 119. At the time of the hearing, Mr. Baker noted some improvement in Pro-Sport's operation and financials. *Id.* at 127-28.

At the close of the November 8, 2024, hearing, the trial court took the matter under advisement and directed the parties to file proposed findings of fact and conclusions of law. Nichols and Appellants complied. On April 3, 2025, the trial court issued an order granting Nichols's petition to appoint a

receiver. As discussed *supra*, the court appointed Holder as the receiver on May 12, 2025.[7]

This appeal followed. Appellants and the trial court have complied with Pa.R.A.P. 1925.

Appellants now raise the following issues for review:

1. Whether the trial court erred in finding that [Nichols] had standing to petition the court for the appointment of a receiver.

2. Whether the trial court erred in granting [Nichols's] petition to appoint a receiver when:

> a. The appointment of a receiver was not necessary to save property from injury or threatened loss of dissipation;
>
> b. There was no imminent danger of property being lost, injured, diminished in value, squandered;
>
> c. There was another safe, expedient, adequate, and less drastic remedy at law available;
>
> d. There was no risk of irreparable damages if a receiver were not appointed;
>
> e. The appointment of a receiver would substantially injure and/or interfere with the rights of creditors and members;
>
> f. The appointment of a receiver would do more harm than good; and/or
>
> g. [Nichols] had unclean hands.

_____

[7] Appellants filed an application for a stay of the April 3, 2025, order pending the instant appeal. Upon order of the trial court, Nichols filed a response opposing Appellants' application for stay. On May 6, 2025, the trial court denied Appellants' application for stay. In its order, the trial court reasoned, in part, that Appellants could not succeed based on the doctrine of unclean hands because there is no evidence that Nichols acted fraudulently or unconscionably. Order, 5/6/25, n.1.

Appellants' Brief at 4-5.

In their first claim, Appellants argue that Nichols lacks standing to petition for appointment of a receiver because he is not a member of Pro-Sport. *Id.* at 31. According to Appellants, the combined $50,000 Nichols paid to Hamid and Abdul was a down payment, and Nichols's 1/3 ownership interest was contingent on his payment of the full purchase price of $625,000. *Id.* at 33. Appellants claim that Nichols **only** paid the $50,000 as a down payment. *Id.* at 35. Appellants acknowledge the Operating Agreement "could have undoubtedly been more artfully crafted," but maintain that the parties' clear intent was that full payment of the $625,000 purchase price was a condition precedent to Nichols acquiring a 1/3 ownership interest. *Id.* at 37.

"Threshold issues of standing are questions of law; thus, our standard of review is *de novo* and our scope of review is plenary." ***Johnson v. American Standard***, 8 A.3d 318, 326 (Pa. 2010). Generally, an individual may assert standing if he is aggrieved, *i.e.*, he has a "substantial, direct and immediate interest in the outcome of the litigation." *Id.* at 329 (citation omitted).

Instantly, the trial court granted Nichols's petition to appoint a receiver under Pa.R.C.P. 1533. The appointment of a temporary receiver under Rule 1533 is a form of equitable relief, and the appointment may be made "without notice if required by the exigencies of the case." Pa.R.C.P. 1533(a). The text of Rule 1533 is silent regarding who may petition for appointment of a

receiver. Our Supreme Cort has explained that "[r]eceivers are appointed only in aid of some *recognized, presently existing, legal right*, and will not be appointed where receivership is the sole relief asked." ***Northampton Nat'l Bank of Easton v. Piscanio***, 379 A.2d 870, 872 (Pa. 1977) (emphasis added).

Though Nichols and Appellants disagree as to Nichols's membership status, Appellants seem to agree that the question of his status is central to the issue of standing. Appellant's Brief at 32 ("[T]he initial question of the inquiry must necessarily involve the determination of whether [] Nichols was in fact a member with standing to petition the trial court for the appointment of a receiver.").

The Operating Agreement provides that "fifty (50%) percent of the net profits of [Pro-Sport] as reasonably determined by all of the Members shall be distributed within fifteen (15) days of the end of each calendar quarter." Complaint, 4/8/24, Exhibit B. In his complaint, Nichols repeatedly averred that Hamid engaged in conduct that was contrary to Pro-Sport's interests and effectively prevented Nichols from enjoying the benefits of his membership. ***See, e.g.***, ***id.*** ¶¶ 56 ("Hamid's [] conduct was designed to exclude [Nichols] as a minority member from enjoying any of the benefits of or participating in Pro-Sport"), 57 ("As a direct result of Hamid's [] conduct, the other members have been damaged and will continue to sustain damages, including the loss of return of their investment in Pro-Sport."), 62(b) ("Hamid used his position

to engage in self-dealing and to enrich himself at the expense of the minority members."), 72 (alleging that distributions were not made in equal shares), 79(e) ("Hamid has failed to issue distributions for the preceding three (3) years"), 86 (alleging damages relating to "reduced and non-existent distributions, impaired relationships, the loss of company value resulting from the diminished capacity of [Nichols] to participate meaningfully in Pro-Sport, and reduced income.").

If members of the LLC use their positions to act against Pro-Sport's interests, there is a reasonable risk of diminished business profits. Diminished profits, in turn, affect the distributions owed to the members. Based on the terms of the Operating Agreement and the allegations in Nichols's complaint, we agree that a member of Pro-Sport has standing to seek the appointment of a receiver in order to protect those interests.

We therefore turn to the question of whether Nichols was a member of Pro-Sport when he initiated the action and petitioned for appointment of a receiver. Nichols's status under the Operating Agreement is a question of contract interpretation. "The interpretation of any contract is a question of law[,] and this Court's scope of review is plenary." *Stephan v. Walden Elec. Heating & Cooling LLC*, 100 A.3d 660, 665 (Pa. Super. 2014).

"When the words of an agreement are clear and unambiguous, the intent of the parties is to be ascertained from the language used in the agreement, which will be given its commonly accepted and plain meaning."

*Miller v. Poole*, 45 A.3d 1143, 1146 (Pa. Super. 2012) (citation, ellipses, and brackets omitted). Extrinsic evidence will be considered only if an ambiguity exists on the fact of the contract. *Id.* We are additionally guided by the following principles:

> First, the entire contract should be read as a whole to give effect to its true purpose. Second, a contract must be interpreted to give effect to all of its provisions. Thus, our Court will not interpret one provision of a contract in a manner which results in another portion being annulled. Third, a word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing in the absence of countervailing reasons, such as thwarting the intent of the agreement. And, finally, a party's performance under the terms of a contract is evidence of the meaning of those terms.

*Toth v. Toth*, 324 A.3d 469, 486 (Pa. Super. 2024) (citation and ellipses omitted).

Here, Hamid and Abdul each executed an Assignment of LLC Membership Interest, issuing to Nichols a 1/3 membership interest in Pro-Sport, with an effective date of January 1, 2022. Complaint, 4/8/24, Exhibit A. The Assignments provided, in relevant part, as follows:

> **NOW, THEREFORE, FOR AND IN CONSIDERATION** of the payment by the terms set forth in the Membership Interest Purchase and Operating Agreement dated of even date herewith, *and for other good and valuable consideration, the receipt and adequacy of which are acknowledged by the Assignor*, it is agreed that as of the Effective Date, the Assignor does hereby assign, set over and deliver to the Assignee and the Assignee accepts and assumes from Assignor, the Membership Interest.

*Id.* (some emphasis added).

The Operating Agreement also details the assignment of a membership interest to Nichols and the consideration for this assignment:

1.1 Assignment of Membership Interest.  On the Effective Date, Sellers shall assign the Membership Interest to [Nichols] and shall deliver the Assignments attached as Exhibit "A," hereto as applicable.

1.2.  Consideration.  On or before April 1, 2022, [Nichols] shall pay to each of Abdul and Hamid twenty-five ($25,000.00) dollars in plain checks.  In addition, the special allocation distributions set forth in Section 3.2 hereof shall be applicable.

*Id.*, Exhibit B.

Moreover, the Operating Agreement detailed the distribution scheme as follows:

3.  DISTRIBUTIONS AND SPECIAL ALLOCATIONS

3.1 Distributions.  [Abdul, Hamid, and Nichols (the Members)] agree that fifty (50%) percent of the net profits of [Pro-Sport] as reasonably determined by all of the Members shall be distributed within fifteen (15) days of the end of each calendar quarter.

3.2 Special Allocation Distributions.  Effective as of the Effective Date[, *i.e.*, January 1, 2022,] and continuing until such time as each of Abdul and Hamid receive One Hundred and Twenty Five Thousand ($125,000) Dollars, all distributions from [Pro-Sport] shall be distributed such that each of Abdul and Hamid shall receive 41.666% and [Nichols] shall receive 16.667%. Thereafter, until such time as each of Abdul and Hamid receive an additional One Hundred and Sixty-Two Thousand Five Hundred ($162,500) Dollars, all distributions from [Pro-Sport] shall be distributed such that each of Abdul and Hamid shall receive 43.333% and [Nichols] shall receive 13.333%. Thereafter, all future distributions shall be divided equally among Abdul, Haid and [Nichols].

Complaint, 4/8/24, Exhibit B ¶¶ 3.1-3.2.

Based on these provisions, the trial court addressed Nichols's membership status as follows:

Interpreting subsections 1.2 and 3.2 together, [Nichols] acquires a membership interest of Pro-Sport after paying $50,000 to [Sellers] and, after [Sellers] each receive an additional $287,500 from distributions, [Nichols] will receive a 33% share of the distributions.

**Nothing in subsection 3.2 makes the $125,000 and $162,500 payment a condition precedent** that must be satisfied before [Nichols's] membership interest in Pro-Sport vest[s]. Subsection 3.2 also fails to state [Nichols] is required to make the $125,000 or $162,500 payments as part of consideration to obtain a membership interest. Instead, it states [Sellers] are to receive the $287,500 from the distributions from Pro-Sport. … Therefore, because [Nichols] paid the $50,000, he has a membership interest in Pro-Sport and has standing to file this Petition.

Trial Court Opinion, 5/14/24, at 13 (emphasis modified; one paragraph break omitted).

We agree with the trial court's conclusion that the unambiguous language of the Operating Agreements and corresponding Assignments reflect an intention by the parties for Nichols's membership interest to take effect upon execution of the Agreement and Assignments, and Nichols's payment of $50,000. The Assignments bear an effective date of January 1, 2022, and explicitly recognize the receipt and adequacy of consideration for Nichols's membership interest. Complaint, 4/8/24, Exhibit A. The only consideration required under subsection 1.2 (which appears under the heading "Transfer of Membership Interest and Consideration") is $25,000 payable to each Hamid and Abdul. *Id.*, Exhibit B.

- 19 -

Contrary to Appellants' assertions, subsection 3.2 (which appears under the heading "Distributions and Special Allocations") does not require additional payment as consideration for Nichols's membership interest. Rather, it simply provides a mechanism through which Nichols acquires an increasing distribution percentage (until he reaches 33.33%), in proportion to his additional payments toward the total purchase price. Accordingly, we conclude Nichols acquired a membership interest upon execution of the Assignments and his payment of $50,000. As a member of Pro-Sport, Nichols has standing to pursue the appointment of a receiver.

In their second claim, Appellants contend the trial court abused its discretion by appointing a receiver. *See* Appellants' Brief at 38-48. Appellants point to the trial court's statement that all parties have engaged in misconduct. *Id.* at 41. Appellants describe the purported misconduct as follows:

> As it relates to Appellants, this involves (1) Hamid, Abdul, and [Hamid's wife's] personal use of Pro-Sport vehicles; (2) alleged increases in salary granted to Appellants; (3) Hamid's personal loan; and (4) Pro-Sport credit card purchases. As it relates to [Nichols], this involves (1) the attempted, unauthorized withdrawal of $150,000 from Pro-Sport accounts; (2) the confiscation of key fobs of vehicles scheduled to be shown, necessitating their replacement; (3) Nichols's redirection of company leads to his personal devices; and (4) Nichols's personal use of Pro-Sport vehicles, even subsequent to his termination.

*Id.* at 42 (some punctuation modified). According to Appellants, Nichols "was precluded from petitioning the trial court for a receiver if the sum of the

alleged misconduct attributable to him precludes him from coming before the court with 'unclean hands.'" *Id.* at 43.[8]

Appellants assert that any vehicles used by Hamid, Hamid's wife, and Abdul were ultimately returned to Pro-Sport and sold. *Id.* Appellants also claim that Hamid's "increase in salary was offset by the removal of expense benefits, resulting in a net-zero change in salary during the time in question." *Id.* at 43-44 (citation to reproduced record omitted).

Additionally, Appellants point to Mr. Trickett's testimony that Mr. Trickett did not identify any unusual or improper expenses on Pro-Sport's American Express credit card bills. *Id.* at 44-45. Appellants also assert that upon hiring Mr. Baker, "the issues [that] could have been used to justify [the appointment of a receiver] were already resolved." *Id.* at 46; *see also id.* at 45-46 (stating Mr. Baker helped Pro Sport "continue on its path to viability by cutting[ ]costs, reviewing inventory, cutting redundant systems, and setting high expectations on accountability for each and every member of the Pro-Sport enterprise.").

"The appointment of a receiver or custodian is a decision left to the sound discretion of the trial court." *Toth*, 324 A.3d at 502; *see also Abrams v. Uchitel*, 806 A.2d 1, 8 (Pa. Super. 2002) ("Although appointment of a

---

[8] "The doctrine of unclean hands requires that one seeking equity act fairly and without fraud or deceit as to the controversy at issue." *Morgan v. Morgan*, 193 A.3d 999, 1005 (Pa. Super. 2018) (citation and emphasis omitted).

receiver is not to be undertaken lightly, the decision to appoint is within the sound discretion of the trial court."). Our Supreme Court has explained that

> [t]he power to appoint a receiver is a delicate one, which is jealously safeguarded, and reluctantly exercised, by the courts. The power should be exercised sparingly, with caution and circumspection, and only in an extreme case under extraordinary circumstances, or under such circumstances as demand or require summary relief.

*Hankin v. Hankin*, 493 A.2d 675, 677 (Pa. 1985) (citation omitted); *see also Tate v. Phila. Transp. Co.*, 190 A.3d 316, 321 (Pa. 1963) ("There is nothing … which affects a corporation with such serious consequences as does the appointment of a receiver[.]" (citation omitted)).

"A receiver will not be appointed unless it appears that the appointment is necessary to save the property from injury or threatened loss or dissipation. Nor will one be appointed where there is another safe, expedient, adequate and less drastic remedy at law." *Piscanio*, 379 A.2d at 872 (citations and brackets omitted). "[R]eceivers can be appointed to assure that partnership assets will not be dissipated…." *Hankin*, 493 A.2d at 677. However, a receiver should not be appointed where the appointment would cause "irreparable injury to the rights and interests of others, where greater injury will probably result from the appointment or where the appointment will do no good…." *Id.*

Instantly, the trial court detailed its reasons for granting Nichols's petition for appointment of a receiver as follows:

- 22 -

Looking at the evidence here, **it appears there was misconduct on both sides**. Firstly, there was evidence that both parties were driving vehicles owned by Pro-Sport. Although [Appellants] state that the Mercedes [vehicles] were subsequently sold and the proceeds given to Pro-Sport, nothing was stated regarding the 911 Por[s]che, trailer, and two Nissans.

Secondly, there was evidence of [the] mishandling of [Sellers'] salar[ies]. [Sellers] gave themselves salary increases totaling $163,400 from March to August 2024. Hamid testified that he increased his salary from $10,000 to $12,500. However, [Hamid] still received $10,000 due to paying $2,500 in health insurance premiums, so his salary remained the same.

Albeit [Nichols] provided evidence that Hamid and Abdul were receiving more than $12,500. On cross examination, Hamid testified that he and [Abdul] were each receiving $13,000 in salary, not $12,500. Notably, this occurred during the time that Pro-Sport was operating at a net loss totaling $606,422 from February to August 2024.

[Appellants] maintain that they were not aware of the financial state of Pro-Sport due to not having a controller. [The trial c]ourt finds this explanation unpersuasive. Even though there was no controller, [Appellants] continued to make consequential financial decisions blindly, instead of waiting until a new controller was hired. For similar reasons, it was improper for Hamid to take out a personal loan, even though it was paid back, when the financial state of [] Pro-Sport was uncertain.

The [c]ourt also concludes that it was improper for [Nichols] to withdraw[] funds from Pro-Sport's accounts. [Nichols's] testimony that he became fearful that Hamid would take money from the company lacks merit. Hamid's conduct, while improper, did not rise to the level that necessitated such drastic action [by Nichols], and appeared to be a form of retaliation. In addition, said action caused more harm than good. Checks bounced[,] which led to Pro-Sport being audited by PennDOT.

Taking the key fobs was also unjustifiable. Hamid had to spend $4,000 to replace the key fobs. [Nichols's] testimony that he was fearful that Abdul would remove vehicles from the sales lot or vandalize them is not supported by the evidence presented.

Indeed, there was no evidence of Abdul threatening to vandalize the vehicles or otherwise removing or damaging them.

Lastly, there was disputing evidence regarding Hamid's making personal purchases on the American Express credit card. [Appellants'] exhibit showed that Hamid incurred several personal expenses between December [] 2023 and July 2024, totaling $11,042.02. On the other hand, the replacement controller[, Mr. Trickett,] testified that the American Express card was used for all Pro-Sport related expenses, the [bookkeeping software], utilities, advertising, buying parts and tires. [Mr. Trickett] also stated there were no unusual expenses. Due to the conflicting evidence, and for the reasons aforementioned, a receiver should be appointed to resolve this ambiguity.

**Although [Appellants] made efforts to correct Pro-Sport's performance since [Nichols's] termination, no efforts were made to address [Sellers'] misconduct of making personal purchases with Pro-Sport's assets and mishandling the administration of their salaries**. Based on the evidence, more steps need to be taken to protect Pro-Sport and its assets from improper conduct from the managing employees[,] or more irreparable damage will result.

[Appellants'] argu[ment that] it was an error for the [c]ourt not to consider another safe, expedient, adequate, and less drastic remedy at law lacks merit[,] when no alternative remedy was ever presented to the [c]ourt for consideration. In addition, [Appellants'] argument regarding the unclean hand[s] doctrine lacks merit.

As [this Court] noted in *Olson v. N. Am. Indus. Supply, Inc.*, 658 A.2d 365-66 (Pa. Super. 1995), whether this doctrine applies is within the sound discretion of the trial court. "The doctrine is implicated when the party's conduct shocks the moral sensibilities of the court; it has nothing to do with the rights or liabilities of the parties." *Jackman v. Pelusi*, 550 A.2d 199, 205 (Pa. Super. 1988).

Here, [Nichols's] conduct of withdrawing money from the Pro-Sport account is not conduct that shocks the moral sensibilities of the [c]ourt. As [Nichols] noted, he returned the monies withdrawn from the operating account. This is enough to grant relief from the doctrine since the harm was remediated. …

There is no additional evidence that [Nichols] acted with fraud or unconscionably with the case at hand. It would be inequitable to punish [Nichols] for conduct that was cured, and [Appellants'] conduct was also improper. According, the appointment of a receiver was correct and warranted in this case….

Trial Court Opinion, 5/14/24, at 14-17 (some citations and brackets omitted; emphasis added).

Upon review, we discern no abuse of the trial court's discretion in granting Nichols's petition to appoint a receiver for Pro-Sport. The evidence demonstrates a contentious relationship between the parties and the mishandling of company funds. We discern no abuse of the trial court's discretion in determining that the appointment of a receiver was necessary to save the subject property from threatened loss or dissipation. *See Piscanio*, 379 A.2d at 872. Additionally, we decline to disturb the trial court's determination that Nichols did not act fraudulently or deceitfully such that the doctrine of unclean hands prohibits relief.

Based upon the foregoing, we affirm the trial court's order granting Nichols's petition to appoint a receiver, as made final by the May 12, 2025, order appointing Holder as receiver.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>7/15/2026</u>